**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| [UNDER SEAL] | § § § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| vs. | § § | |
| [UNDER SEAL] | § § § § § § § § § | **DO NOT ENTER INTO PACER** **DO NOT PLACE IN PRESS BOX** |

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA AND THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* James Bresnahan | § § § § § | Civil Action No. _____ |
| Plaintiffs, | § § | JURY TRIAL DEMAND |
| vs. | § § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| TRAVELER'S TRANSIT, INC.; MONTACHUSETT REGIONAL TRANSIT AUTHORITY; GREATER ATTLEBORO-TAUNTON REGIONAL TRANSIT AUTHORITY, | § § § § § § | **DO NOT ENTER INTO PACER** |
| Defendants. | § § § § § § | **DO NOT PLACE IN PRESS BOX** |

## COMPLAINT

1. *Qui Tam* Relator, James Bresnahan, brings this action on behalf of himself and the United States of America for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and on behalf of the Commonwealth of Massachusetts pursuant to MASS. GEN. LAWS. ch. 12, § 5B *et seq.*

2. Defendants have knowingly submitted and caused the submission of false claims to agencies within the Executive Office of Health and Human Services ("EOHHS") for approval and payment in the form of transportation invoices for program-based rides not provided to patients enrolled in either the Commonwealth's Medicaid program ("MassHealth") or the Department

of Developmental Services ("DDS").  In so doing, Defendants violated both the Federal False Claims Act the Massachusetts False Claims Act.

## INTRODUCTION

3. In contravention of contractual requirements, Defendant Traveler's Transit unilaterally and illegally combined certain individually contracted and geographically disparate transportation routes together, resulting in fewer routes driven, but submitted invoices for payment to MART and GATRA as if all the occurred routes had been driven individually and otherwise as contracted. In addition, Traveler's Transit failed to keep routes, including the combined routes, under a maximum of ninety minutes and failed to provide required Monitors as contracted. This conduct violated the Federal and Massachusetts False Claims Acts for at least three reasons: 1) as Traveler's Transit submitted invoices for payment or approval for rides that did not occur **and** for rides that were impermissibly combined; (2) Traveler's Transit submitted invoices for payment or approval for rides that exceeded ninety minutes, and (3) Traveler's Transit submitted invoices for payment or approval that falsely included claims for Monitoring when it was not provided.  All Traveler's Transit invoices containing any or all of these defects were, therefore, false on their face.

4. Furthermore, MART and GATRA caused false claims to be presented to the Commonwealth of Massachusetts and the United States when they, as transportation brokers who facilitate transportation services, neglected their contractual responsibilities to ensure the accuracy of Traveler's Transit's invoices and compliance with its obligations, and in failing to do so, billed

MassHealth and DDS for the rides that were never provided or were otherwise provided in violation of the terms of MassHealth's and DDS's requirements.[1]

5. Specifically, Traveler's Transit knowingly completed and submitted for approval and payment false transportation invoices for hundreds of rides. The majority of this amount resulted from the elimination or combination of individually contracted routes and rides undertaken without permission from the government.

6. Despite being contractually obligated to provide separate vehicles for separate routes, to provide rides that did not exceed ninety minutes, and to provide Monitors when required, from at least 2017 to 2020, Traveler's Transit submitted invoices to MART and GATRA, who billed the government, for rides that never occurred, that occurred on impermissibly combined routes, that took longer than 90 minutes, often as a result of the impermissible route combination, and that lacked a Monitor when a Monitor was required.

7. To effect the impermissible route combinations, passengers assigned to routes by MART and GATRA were unilaterally reassigned by Traveler's Transit to other routes driven on fewer vehicles. Traveler's Transit did not correct its invoices to account for the eliminated routes. Instead, it submitted invoices as if those routes had occurred as contracted—that is, on individually assigned vehicles not exceeding ninety minutes and/or with Monitors when required. In each such instance, Traveler's Transit double-billed MART and GATRA for weekly vehicle costs on both those routes that were never driven *and* for the secretly combined route. To hide its fraud, Traveler's Transit submitted false invoices which showed that the affected passengers rode on their assigned individual routes as required, even though

---

[1] MART was previously found to have submitted false claims to the government for thousands of rides its transportation subcontractors never provided. https://www.mass.gov/news/montachusett-regional-transit-authority-to-pay-300000-to-resolve-allegations-of-submitting-false-claims-to-masshealth

Traveler's Transit records showed the opposite: passengers' routes were routinely combined and driven in violation of MassHealth and DDS requirements.

8. Traveler's Transit's owner, Kathleen Legare, reviewed and certified every invoice, including all fraudulent invoices, before they were submitted to MART and GATRA for approval and payment. Ms. Legare made the decision to eliminate certain routes as a way of reducing operating expenses or to cover for an insufficient number of qualified drivers, and she had actual knowledge that invoices contained materially false information.[2] Despite this, Traveler's Transit submitted all fraudulent invoices to MART and GATRA seeking full payment as if all rides had been provided as contracted and required.

9. Further, after previously violating the False Claims Act by submitting claims for reimbursement for rides that never happened, MART and GATRA did not implement or enforce adequate verification procedures to ensure that Traveler's Transit submitted accurate and truthful invoices for payment or approval. In the face of several audits that it was contractually required to perform, MART and GATRA never discovered or deterred the fraudulent activity, leading DDS and MassHealth to ultimately reimburse Traveler's Transit for rides that never occurred or otherwise did not meet DDS and MassHealth requirements. MART and GATRA's negligent review and certification of the fraudulent invoices violated the Federal and Massachusetts False Claims Acts.

10. This fraud has taken a human toll as well: passengers impacted by the elimination and combination of routes were forced to remain *en route* for longer than the contractually mandated ninety-minute time limit, a requirement that is specific to brokered transportation

---

[2] It is possible that Ms. Legare may have also fraudulently induced the award of the MART and GATRA contracts by falsely representing that Traveler's Transit was able to provide the appropriate number of drivers and vehicles necessary to provide its services as contracted.

for MassHealth and DDS patients. Vehicle capacity limits—made more stringent by the Covid-19 pandemic—were similarly disregarded, directly jeopardizing the health of all vehicle occupants.

11. The contractually mandated ninety-minute time limit and vehicle capacity limits results in multiple trips to a single destination, with each trip assigned a distinct route number. In contravention of its contractual duties, Traveler's Transit unilaterally and without authorization combined routes solely at its own discretion so that fewer than the required number of vehicles were operational yet billed as though they were.

12. As a result, Defendants stole from federal and state funded programs meant to provide critical transportation services to DDS and MassHealth patients, and taxpayers were ultimately responsible for paying the inflated tab for rides that never occurred, rides that occurred in contravention of time and occupancy requirements, and rides that lacked required Monitors.

13. In order to redress these harms, on behalf of the United States of America and the Commonwealth of Massachusetts, Relator brings this *qui tam* Complaint against Defendants alleging False Claims Act violations arising from the elimination of federal and state funded transit rides and Monitoring services.

## JURISDICTION AND VENUE

14. This action arises under the United States Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the Massachusetts False Claims Act, MASS. GEN. LAW ch. 12, § 5B *et seq.* ("MFCA").

15. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and it has supplemental jurisdiction over the counts relating to MASS. GEN. LAWS. ch. 12, § 5B *et seq.* pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

16. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District.

17. Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendants transact business in this District and acts violative of the FCA and MFCA occurred in this District.

18. Relator is the original source of these allegations and has direct and independent knowledge of the information herein within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B).

19. Relator denies that there has been a public disclosure or that the facts alleged herein have been publicly disclosed in any federal criminal, civil, or administrative hearing in which the Government or its Agent is party in a Congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation.

20. Should any public disclosure have occurred, unbeknownst to Relator, prior to the filing of this Complaint, Relator's knowledge is independent of such disclosure and Relator's knowledge would materially add to any public allegations or information.

21. Prior to filing this Complaint, Relator voluntarily disclosed to the United States and the Commonwealth of Massachusetts the information on which his allegations are based.

## **PARTIES**

22. Relator, James Bresnahan, is a citizen of the United States and North Smithfield, Rhode Island. Mr. Bresnahan worked for Defendant, Traveler's Transit, for over thirteen years, first as a driver and then as Assistant Transportation Manager. In his capacity as Assistant Transportation Manager he reported to Richard Tetreault and Kathleen Legare and was responsible for many of Traveler's Transit's daily operations at their direction and under their supervision.

23. Defendant, Traveler's Transit, Inc., is a Massachusetts-based transportation company with its principal office located at 106 Grove Street, Millville, MA 01529. Traveler's Transit subcontracts with MART and GATRA to provide curb-to-curb transportation services to and from DDS and MassHealth programs for enrolled patients. Traveler's Transit submits transit invoices and attendance records to MART and GATRA and is reimbursed with federal and state money for the cost of providing transportation services to DDS and MassHealth patients.

24. Defendant, MART is a Regional Transit Authority established by the cities of Fitchburg, Leominster and Gardner pursuant to Section 3 of MASS. GEN. LAWS ch. 161B as a body politic and corporate and political subdivision of the Commonwealth of Massachusetts. MART contracts with EOHHS to facilitate transportation for eligible consumers receiving services from Massachusetts agencies including DDS and MassHealth. MART provides brokerage services to the greater Metro Boston, Pioneer Valley, North Central, Lowell, and the South Central areas. MART subcontracts with third-party transportation providers, including Traveler's Transit, to provide transportation directly to DDS and MassHealth patients.

25. Defendant, GATRA is a Regional Transit Authority established by various cities and towns constituting the Authority pursuant to Section 3 of MASS. GEN. LAWS ch. 161B as a body politic and corporate and political subdivision of the Commonwealth of Massachusetts. GATRA contracts with EOHHS to facilitate transportation for eligible consumers receiving services from Massachusetts agencies, including DDS and MassHealth. GATRA provides brokerage services to the Southern Norfolk County, Northern Bristol County, Plymouth County, and South Shore areas. GATRA subcontracts with third-party transportation providers, including Traveler's Transit, to provide transportation directly to DDS and MassHealth patients.

## **REGULATORY BACKGROUND**

I.     **Transportation for MassHealth and DDS Patients**

26. MassHealth constitutes the medical assistance and benefit programs of the Commonwealth administered by EOHHS pursuant to Title XIX of the Social Security Act (42 U.S.C. § 1396), Title XXI of the Social Security Act (42 U.S.C. § 1397), and Mass Gen. Laws. ch. 118E. MassHealth pays for certain health care services for low- and medium-income people living in the Commonwealth.

27. MassHealth members have access to a variety of health care services and benefits in accordance with member coverage types. Massachusetts regulations specify the different coverage types and describe the medical services that MassHealth pays for.

28. Depending on a member's coverage type, MassHealth will pay for non-emergency transportation to and from covered services when access to public or private transportation is unavailable.

29. The federal and state governments, through its Medicaid programs, are among the principal payers responsible for reimbursing Defendants for transportation services. The federal government typically reimburses MassHealth for fifty percent of MassHealth spending, and MassHealth covers the full cost of transportation for eligible members.

30. Transportation services are included in the MassHealth Standard, CommonHealth, and CarePlus coverage types. Examples of covered services for which transportation to and from is provided to members within these coverage types include, but is not limited to, doctor's appointments, counseling, day habilitation, and dental services.

31. Similar to MassHealth, the Department of Developmental Services ("DDS")—an agency within the purview of EOHHS—provides transportation services for enrolled members. DDS contracts with non-profit agencies to support children and adults with intellectual and

developmental disabilities. According to DDS, "The Department serves over 32,000 adults and an additional 9,000 children across the state to assist in transitions from school to adult life and to provide support for individuals through an individualized, person-centered approach."

32. Once members are approved for MassHealth or DDS transportation, they are assigned to a transportation Broker.  The Commonwealth of Massachusetts established a statewide Human Service Transportation ("HST") coordination initiative within EOHHS which utilizes a Broker system of transportation management to provide transportation services to eligible consumers from various programs and state agencies, including MassHealth and DDS members.  To facilitate these services, EOHHS enters into selective contracts with transportation Brokers.

33. The HST brokerage system is structured on two different transportation models. Transportation is provided either on an as needed basis in response to an approved request by a MassHealth member—so called demand-response transportation—or on a regular schedule to a common program or destination facility—so called program-based transportation. Program-based transportation is typically provided on a scheduled route grouped-trip basis and includes transportation to MassHealth-funded Day Habilitation and DDS programs, the programs that Defendant Traveler's Transit serviced.

34. Regional Transit Authorities (collectively, "the Authorities"), including MART and GATRA, are one such HST transportation Broker under selective contract with EOHHS to facilitate transportation services to DDS and MassHealth members.  Selected Regional Transit Authorities procure and manage non-emergency transportation services for DDS and MassHealth members in a designated area.  There are six Regional Transit Authority Brokers in Massachusetts that, collectively, operate in nine distinct areas encompassing all cities and towns within Massachusetts.

35. To schedule transportation to and from covered services, DDS and MassHealth members contact their respective Regional Transit Authority directly. The Authorities then coordinate with one of their subcontractors—various private sector transportation companies—to provide rides to DDS and MassHealth members.

36. Third-party transportation companies intending to subcontract with the Authorities must bid through a formal selection process. Transportation rates are negotiated by contract, and the Authorities reimburse providers for their services.

37. The Authorities are fully responsible for the performance of their subcontractors and must seek EOHHS's prior approval before entering into any subcontracts with third-party transportation providers.

38. Payment to the Authorities for brokered transportation is made in accordance with the terms the selective contract with EOHHS, which stipulates that the Authorities will be reimbursed for authorized rides billed by third-party transportation providers. Payment, however, is calculated differently depending on whether the trip falls under the program-based or demand-response model.

39. For program-based transportation, the kind of transportation at issue in this Complaint, the Authorities receive a monthly capitated rate for each consumer who receives qualified program-based transportation in that month, and the Authorities bill the appropriate agency, in this case, EOHHS—on behalf of DDS and MassHealth—for the number of consumers provided program-based transportation each month.

40. In addition, the HST office pays the Authorities a management fee for its brokerage services. The management fee is composed of two parts. A trip-based management fee is paid for each Demand-Response trip completed in a particular month, and a capitation-based fee is paid in

relation to the number of consumers who receive qualified program-based transportation in a particular month.

41. To ensure, among other things, that scheduled trips are performed as authorized and as billed, and that inappropriate charges by third-party transportation providers can be identified and resolved, the Authorities are responsible for implementing oversight requirements.  One such requirement is that the Authorities must conduct unannounced on-site service inspections of transportation providers at regularly scheduled consumer drop-off or pick-up times.

## II.    MART and GATRA's Subcontracts with Traveler's Transit

42. As transportation Brokers, MART and GATRA are responsible for the performance of a variety of administrative functions.  These responsibilities include: processing transportation requests in accordance with the needs of DDS and MassHealth members, managing the entire pick-up and delivery transportation network within a designated area, ensuring the satisfactory performance of each of their subcontractors, conducting safety instruction, performing vehicle inspections, and Monitoring for quality and cost control.

43. As entities not authorized to provide rides directly to DDS and MassHealth patients, MART and GATRA delegate actual transit through subcontracts with qualified, third-party transportation providers offering curb-to-curb ride services.

44. There are over 300 different transportation providers in Massachusetts, one of which is Traveler's Transit. Both MART and GATRA, at all times relevant, subcontracted with Traveler's Transit to provide transportation to DDS and MassHealth members.

45. Per the subcontracts, Traveler's Transit bills MART and GATRA monthly for rides provided to DDS and MassHealth members in accordance with agency specifications.  Prior to submitting trip invoices to MART and GATRA, Traveler's Transit is required to ensure that

all trip invoices had been verified and accompanied by any required, supporting documentation.

46. Verification of the trip invoices, as agreed to in the subcontracts, means that Traveler's Transit must implement certain mandatory items into its verification system. These items include, but are not limited to, the following:

- Daily trip sheet[s] identifying each scheduled one-way trip with a check box indicating if the Consumer was transported, canceled or was a no-show and signed by the driver (and by program staff, if required). Trip Sheets should also include Consumer pickup and drop-off times.
- Random, on-site inspections at destination facilitates by supervisory staff.
- Random surveys of destination facilities to confirm transportation.
- Random surveys of Consumers to confirm transportation (and pick-up and drop-off times and quality of service).

47. To ensure that Traveler's Transit is in compliance with its verification system, that its invoices are accurate, and that all consumer trips are performed in a timely and satisfactory manner, the subcontracts also require MART and GATRA to establish and maintain appropriate verification procedures, which include inspections and audits of Traveler's Transit's operations.

48. Once Traveler's Transit submits its trip invoices, MART and GATRA pay Traveler's Transit for the cost of the trips with money allocated from MassHealth and DDS within forty-five days from the date MART and GATRA receive the finalized invoices.

49. MART and GATRA do not pay for trips that are unauthorized, canceled, or otherwise not provided because of Traveler's Transit or passenger error.

50. MART and GATRA have the right to approve all aspects of the trips provided to DDS and MassHealth patients, and Traveler's Transit must obtain prior authorization from the applicable Authority prior to making any changes to a scheduled trip, including all stops,

pickup times, and route changes. In turn, MART and GATRA must receive prior approval from EOHHS for any new or modified routes.

51. Traveler's Transit is required by contract to limit routing times to ninety minutes from the time of first pickup through until the final destination on the route. Thus, no DDS or MassHealth patient can be driven for longer than ninety minutes.

52. In addition, no trip may carry passengers in excess of a vehicle's capacity limit.

53. If Traveler's Transit accepts a trip that MART or GATRA assigns to it, it is obligated to complete that assignment unless it is properly cancelled. Waivers of these standards must be in writing and approved only at the discretion of MART or GATRA.

54. In the case of program-based transportation, Traveler's Transit is prohibited from combining routes going to different sites without the applicable Authority's written approval.

55. Additionally, the subcontract requires Traveler's Transit to notify the applicable Authority of any incidents that occur during the transit of DDS or MassHealth members. An incident is defined as any occurrence that impacts the provision of normal transportation services. This definition encompasses things such as passenger injuries, disruptive passenger behavior, late pick-ups, or vehicle no-shows. A formal written report must also be submitted within twenty-four hours of any emergency that occurs while in transit.

### III.   Monitors

56. Upon MART or GATRA's request, Traveler's Transit must provide and assign transportation safety Monitors for certain trips. A Monitor is a Traveler's Transit employee or subcontractor who serves to assist or ensure the safety of one or more DDS or MassHealth member during transportation. A Monitor is designated member-specific assignments and supervises and

assists those members while on the vehicle. When necessary, Monitors also provide mobility assistance to help with entering or exiting the vehicle or destination.

57. At all times relevant, Traveler's Transit billed MART and GATRA, who in turn billed DDS and MassHealth, for trips and Monitors provided by Traveler's Transit for DDS and MassHealth members. DDS and MassHealth reimbursed MART and GATRA for the cost paid to Traveler's Transit for its transportation services with state and federal money.

## FACTS

### I.    Traveler's Transit's Operations

58. Traveler's Transit is one of three transportation subsidiaries of Valley Transportation Corporation, the parent company based in Woonsocket, Rhode Island. Having subcontracted with both MART and GATRA, Traveler's Transit provides transportation in Massachusetts for youths and adults enrolled in early intervention, special education, and special needs programs.

59. To be a driver for Traveler's Transit, one must be at least twenty-one years old, have an acceptable driving record, and pass a criminal background check. If hired, the driver is assigned to a specific route operating within either MART or GATRA's geographical region. Traveler's Transit routes are specific to either MART or GATRA.

60. Program-based routes—the ones relevant to the allegations in this Complaint—are created by MART and GATRA. MART and GATRA assign DDS and MassHealth patients to these routes based on the facility they are traveling to and from. Only one vehicle operates on a route. Occasionally, multiple vehicles travel to the same facility because of the need to comply with the contract's ninety-minute and vehicle capacity limits.

61. Once passengers have been assigned, MART and GATRA send Traveler's Transit a list of routes with the names of the passengers assigned to each, referred to as "Route Sheets." When

MART or GATRA assigns its routes to Traveler's Transit, the Route Sheets explicitly indicate whether a Monitor is to be provided. If one is, there will be a field on the top of the Route Sheet with the heading "Monitor" and then the name of the Monitor. If no Monitor is assigned, the Route Sheet will not have a "Monitor" heading.

62. Unless MART and GATRA are properly notified of any schedule or Monitor changes, Traveler's Transit must transport passengers in accordance with these Route Sheet assignments.

63. The passengers transported by Traveler's Transit consist of DDS and MassHealth Day Habilitation patients, and others receiving program-based services. Patients enrolled in one or more of these programs are working to achieve measurable, behavioral-based goals to reach an optimal level of physical, cognitive, psychosocial, and occupational wellness. For this reason, each individual requires reliable, daily transportation to and from their program's location.

64. Thus, to help verify that each individual is receiving quality transportation in accordance with MassHealth and DDS requirements to and from their scheduled program, the subcontracts between Traveler's Transit and MART and GATRA require that certain trip records be kept and maintained.

65. Traveler's Transit documents its operations in multiple ways. The first is through "Daily Sheets." Daily Sheets are an attendance sheet that is used to track, among other things, whether each driver is on time for their shift in the morning and afternoon, and whether a Monitor is assigned to a specific route for that day. While he was employed by Traveler's Transit, one of Relator's assignments was to transfer data from the employee "log books"—an informal attendance record completed by the drivers—to the more formal Daily Sheets so that Traveler's

Transit would have a record of which drivers were covering each route and the time each driver checked in for his or her shift.

66. If a substitute driver is covering for the route's regularly assigned driver, the substitute driver's name is written on the Daily Sheet in either the "AM Coverage" or "PM Coverage" column, depending on when in the day the coverage occurs. Any passenger cancellations are also written on the Daily Sheet in the "Cancellations" column.

67. The second way Traveler's Transit documents its operations is by using the "Employee Time Sheets." These forms are completed by Traveler's Transit drivers and are used to track passenger attendance and pertinent trip information, such as the number of miles driven per day and the amount of time the vehicle is en route, for each trip during the week.

68. As each passenger is picked up, the driver writes the passenger's name on his Employee Time Sheet in the "Consumers Name" [sic] column and, indicating whether the passenger's trip occurred in the morning or the afternoon, marks the corresponding box for each day of the week. Thus, if a passenger rode on both Monday morning and Monday afternoon, the driver will make two marks in the Monday column next to that passenger's name.

69. The driver must also track certain trip information on his Employee Time Sheet. At the bottom of the sheet, the driver records, for each day of the week, the trip's start and end time, the vehicle's odometer reading, and any notes relating to special runs or extra work.

70. A third method used to document trips is through the Driver Attendance Sheets, which are very similar to the Employee Time Sheets and are filled in by the drivers and used to record passenger attendance on an assigned route.

71. Traveler's Transit bills MART and GATRA twice per month by submitting route-specific invoices. The invoice templates are supplied to Traveler's Transit from MART and GATRA

through those entities' respective online portals and are specific to each route. Because MART and GATRA assign passengers to each of the routes in advance, and because, contractually, there is only one vehicle operating per route, MART and GATRA know which passengers will receive transportation on each route, and so the supplied invoices already include the names of each passenger assigned to receive transportation each billing cycle.

72. In addition to the pre-populated names of assigned passengers, each route-specific invoice contains spaces for information to be inputted regarding the transportation of those passengers on that route, including: the dates on each billing cycle where service was provided (and whether it was for a one-way or two-way trip); the total number of trips; the number of Monitors used; the Monitor cost per day; and, crucially, the number of days on which a Traveler's Transit vehicle was used to transport the assigned passengers, the total vehicle cost per day, and the total vehicle cost for the billing period.

73. There are also fields used to input how these costs should be allocated to MassHealth, DDS, and ICO, depending on the services being provided to the assigned passengers.

74. The invoices are filled out by an employee of Traveler's Transit using the passenger trip data contained in the Daily Sheets, Route Sheets, and Employee Time Sheets. MART and GATRA review the invoices and then send them to MassHealth and DDS for payment.

75. Thus, when it comes time to bill for its services, Traveler's Transit's responsibility—undertaken by Relator at the direction of Traveler's Transit management—is to mark the boxes on the invoices for each day that the passengers were supposedly transported during the respective billing cycle. Based on how those boxes are marked, the invoice will generate the costs, including vehicle and Monitor costs, owed to Traveler's Transit by MART or GATRA. If Traveler's Transit marks boxes indicating that it provided transportation to the assigned

passengers on a route for five days of that billing cycle, the invoice will register that Traveler's Transit is owed five days-worth of vehicle costs for those rides and the appropriate amount of fees for purportedly transporting the passengers as agreed; i.e. on separate vehicles not exceeding ninety minutes.

## II.    The Fraudulent Scheme

76. Between at least December 2017 and March 2020, Traveler's Transit submitted invoices to MART and GATRA for rides that never occurred as agreed and on vehicles that were never driven. They did this by eliminating or combining individually contracted routes into one, in an unapproved and undisclosed effort to reduce its own operating expenses, despite its concurrent failure to meet state and contractual standards.

77. Upon information and belief, and Relator's first-hand knowledge, in direct contravention of its contractual obligations, Traveler's Transit never sought and was never granted permission by either MART or GATRA to combine any of the individual program-based routes for which it was assigned to provide transportation services. This secret and unauthorized combination of routes resulted in route times longer than ninety minutes and created rides on vehicles in excess of capacity, a blatant and direct violation of the contracts Traveler's Transit signed with MART and GATRA.

78. Passengers assigned to routes by MART and GATRA that had been unilaterally combined by Traveler's Transit were reassigned by Traveler's Transit to other routes that were still operational. To keep track of the reassigned passengers, drivers internally recorded these passengers' names and their assigned routes on their Employee Time Sheets and Driver Attendance Sheets for the now-combined routes.

79. Traveler's Transit did not correct its invoices to account for the eliminated routes, however. Instead, they submitted false invoices as if those routes had occurred as contracted. In addition, because they falsely claimed to have transported those individuals on their assigned routes—despite shifting them to a combined route—Traveler's Transit still billed MART and GATRA for the thousands of dollars in weekly vehicle costs on those routes for which no vehicle was ever driven.

80. Moreover, MART and GATRA did not have adequate verification procedures in place to ensure that Traveler's Transit submitted accurate invoices. Despite several audits which required them to verify that scheduled trips were performed as authorized and as billed, MART and GATRA never discovered or deterred the fraudulent activity, leading DDS and MassHealth to ultimately reimburse for rides that Traveler's Transit did not provide to patients. Indeed, a simple review of the Invoices with Employee Time Sheets and Driver Attendance Sheets would disclose that rides were not driven as agreed and on phantom vehicles for which Traveler's Transit sought reimbursement.

81. Several billing cycles between December 2017 and March 2020 reveal the fraud: passengers that had been internally reassigned to combined routes by Traveler's Transit were billed as having ridden on their originally-assigned—but in fact combined—individual route. These invoices show that Traveler's Transit billed MART and GATRA for vehicle costs for vehicles that were never used to transport the covertly reassigned passengers.

82. By lying on invoices that it certified were accurate, Traveler's Transit submitted materially false information to MART and GATRA as the basis for their reimbursement.

83. Additionally, Traveler's Transit's fraudulent scheme to eliminate and combine routes caused DDS and MassHealth passengers to travel for longer than the contractually mandated ninety-

minute trip duration limit because there were more pickups and drop-offs than usual.  Vehicle capacity limits were also violated because certain routes were combined, which caused passengers to be assigned to a single vehicle in contravention of the vehicle and route time limits.

84. Because Traveler's Transit withheld the truth about the underlying route for which it billed— i.e., that the route was comprised of illicitly-combined passengers resulting in ride times longer than ninety-minutes—each of the invoices it submitted in which it indicated the rides had occurred as agreed, was false.

85. Combining routes also meant that some passengers requiring Monitoring services were placed on routes without a Monitor. The failure to provide Monitoring services was a health and safety violation and fraud since Traveler's Transit billed MART and GATRA as if all Monitors had been provided. The decision to eliminate routes was made at the direction of Traveler's Transit's manager Richard Tetreault, and approved by the owner, Kathleen Legare.  A Traveler's Transit manager would eliminate a route and then notify the driver of a different route that they would need to pick up the affected passengers.  The drivers usually received this instruction in advance of their scheduled routes that day, but occasionally they were called while already en route.

86. Picking up non-scheduled or additional passengers was highly burdensome for drivers.  More time was required to ensure that everyone was picked up and safely transported to their destination.  Frequently, the additional passengers were wheelchair-bound, and thus the driver had to spend more time than usual helping the passengers with ingress and egress.

87. To hide its fraud, Traveler's Transit submitted false invoices which showed that the affected passengers rode on their individual routes and on individual vehicles, despite the fact that their

own internal documentation (Employee Time Sheets and Driver Attendance Sheets) showed the opposite: passengers' routes were routinely combined and driven on shared vehicles.

88. Traveler's Transit's owner reviewed and certified every invoice, include all the ones that were fraudulent, before they were submitted to MART and GATRA for approval. The owner made the decision to eliminate certain routes as a way of reducing operating expenses, and she had actual knowledge that some of the invoices contained materially false information. Despite having knowledge that the invoices contained fraudulent information, the owner submitted all of the fraudulent invoices to MART and GATRA anyway.

89. MART and GATRA's review and certification of the fraudulent invoices subsequently made them complicit in the FCA and MFCA violations. MART and GATRA submitted invoices containing fraud to DDS and MassHealth, and the agencies paid Defendants for all of the rides that were never provided as contracted using federal and state money.

90. Traveler's Transit also routinely submitted invoices for payment that falsely claimed Monitor services were provided on a route when they were not.

   a. **May 1-15, 2019 billing cycle**

91. From the time period spanning May 1, 2019 through May 15, 2019 ("May 15, 2019 billing cycle"), Traveler's Transit unilaterally combined a number of separate routes under contract with MART and GATRA.

92. During the May 15, 2019 billing cycle a Traveler's Transit manager assigned passengers from routes that the company intended to combine with other routes traveling to the passengers' same destination.

93. Specifically during this billing period, in an effort to "paper" their files in case of an inspection, Traveler's Transit's owner approved the new passenger assignments and instructed drivers to

start using company-provided, blank "add-on" sheets—in combination with their Employee Time Sheets—to record the names of the added passengers.

94. The owner wrote the new add-on policy on a dry erase board that was kept near the front desk at company headquarters where drivers would see it. It read, "As of Monday each DDS Route Sheet will have a blank attendance sheet in it. If you have any add ons (sic) from another route please write them on the Blank Attendance sheet."

95. Fearing that an audit by MART or GATRA would reveal the company's unauthorized practice of combining and eliminating routes, the owner decided that it was necessary to hide the fraudulent activities by using the "add-on" sheets as instructed to drivers on the white board.

96. Separating the names of unauthorized passengers to these "add-on" sheets allowed for easy transfer to a passenger's "correct" attendance sheet at the time of billing. After the names of the passengers had been transferred from the "add-on" sheets to the "correct" sheets, Traveler's Transit management, with full knowledge of their fraudulent purpose, instructed their employees to shred the add-on sheets.

### i. Route HME71

97. During the May 15, 2019 billing cycle, Traveler's Transit was under contract with MART to provide transportation services for MassHealth Day Habilitation and DDS patients traveling to the Horace Mann Educational Associates facility in Millbury, Massachusetts, known as "Route HME71."

98. Passengers L, C, and G[3] were all assigned by MART to Route HME71 during the May 15, 2019 billing cycle, which meant that Traveler's Transit had to provide them with a dedicated vehicle assigned to Route HME71 to transport them to and from their destinations. But from

---

[3] Passengers' full surnames have been omitted from this Complaint for their privacy; the first initial of their surname is used instead.

May 6 through 10, none of these Route HME71 passengers rode on the dedicated vehicle that was supposed to be assigned to this route. Instead, Traveler's Transit unilaterally and without permission combined Route HME71 with two other routes, HME76 and HME79. This meant that the three HME71 passengers were not transported on their own dedicated vehicle but rather with the other passengers from these other routes on a shared, different vehicle.

99. Specifically, from May 6 through 10, HME71 passengers L and G rode on a vehicle used for Route HME76, a different MART route, with HME76 passengers. Internal Employee Time Sheets and Driver Attendance Sheets confirm this. For example, the Employee Time Sheet, week-ending date 5/11/19 (a Saturday), confirms the routes were combined, noting under the "route number" heading that this Employee Time Sheet was for "HME-76-71." Further, passengers L and G are listed under the "Consumers Name" column in addition to the five (5) HME76 passengers. Passengers L and G are noted as each having received rides to and from their destinations each day that week on Monday through Friday, May 6-10.

100. The Driver Attendance Sheet for HME76 also contains this same information, indicating that for "Route # HME 76," passengers L and G were transported (along with assigned HME76 passengers) to and from their destinations each day that week on Monday through Friday, May 6-10. Notably, L and G's names are handwritten on the Driver Attendance Sheet below the printed names of the properly assigned HME76 passengers, further evidencing that HME76 contained passengers not assigned to it by MART, but instead internally combined by Traveler's Transit.

101. HME71 passenger C rode on a vehicle on yet another MART route, HME79. Internal Employee Time Sheets confirm this. For example, the Employee Time Sheet, week-ending date 5/11/19 (a Saturday), confirms the routes were combined, noting under the "route number"

heading that this Employee Time Sheet was for "HME-79," but including under the "Consumers Name" heading, along with the three (3) assigned HME79 Passengers, the name of passenger C, with a notation next to the name of "HME 71." Passenger C is noted as having received rides to and from his destination each day, Monday through Friday, May 6-10.

102.    No dedicated separate vehicle was used to provide rides to Route HME71 passengers L, C, or G during this May 6-10 timeframe because, as the Employee Time Sheets and Driver Attendance sheets confirm, they were riding on other vehicles alongside passengers from the other routes.

103.    The Route HME71 invoice corresponding to the May 15, 2019 billing cycle, however, states that passengers L, C, and G received a total of thirty rides (30) on Route HME71 on their own HME71 vehicle throughout the five day period (May 6-10) when Route HME71 was in fact combined with Routes 76 and 79 and no separate dedicated vehicle was used to transport the HME71 passengers. Traveler's Transit then further falsely claimed it incurred daily vehicle expenses from May 6-10 of $213.00/day for vehicles it did not use on Route HME71.

104.    Specifically, the May 1-May 15, 2019 Route HME71 Invoice includes the following information: fields noting that MART is the broker; that "Traveler's Transit, Inc" is the contractor; that the invoice is for "HME-71;" that the invoice is for the pre-populated HME71-assigned passengers, namely L, C, and G; and a field including each date of the billing cycle (May 1-15) where Traveler's Transit had to mark whether passengers L, C, and G received rides to their destinations on that date and if so, whether that was a one-way (1) or round-trip (2) ride.

105.    This Invoice was false because Traveler's Transit marked passengers L, C, and G as all having received their individually contracted rides (30 in all) on Route HME71 on May 6, 7,

8, 9, 10, when they did not because they rode on Routes HME 76 and 79 instead, as evidenced by the Employee Time Sheets and Driver Attendance Sheets.

106.    This Invoice was also false because Traveler's Transit billed MART for the daily vehicle cost for transporting passengers L, C, and G for the May 6- May 10 time period, even though no such rides occurred on a dedicated vehicle assigned to HME 71. Traveler's Transit therefore falsely charged MART $213.00/day for the cost of a vehicle that was never used on HME 71.

107.    This intentional falsity is further evidenced by the fact that Traveler's Transit did not adjust or take a discount on the daily vehicle cost for the vehicles that were in fact used to transport the combined HME71 passengers with the passengers from Routes 76 and 79. Instead, Traveler's Transit double-billed the government for ***both*** the vehicles used to transport the passengers on the combined routes ***and*** for the phantom vehicles that were never used to transport the HME71 passengers on their own route.

108.    This double-billing is confirmed by a May 1-May 15, 2019 MART Vehicle Cost Ledger, which summarizes each of Traveler's Transit's routes for the time period, the number of days in which they allegedly provided service for those routes, the per day vehicle cost for each of those routes, and a total invoiced amount (the amount of days a vehicle was used multiplied by the per day price).

109.    Notably, under the heading "Trip Summary Site#/Route#," Traveler's Transit billed for vehicle costs for Routes HME76, HME79, and HME71, each for 11 days of the same billing cycle (May 1- May 15, 2019). For Route HME76, Traveler's Transit billed 11 days at a vehicle cost of $241.00/day for a total of $2,651.00; for Route HME79, Traveler's Transit billed 11 days at a vehicle cost of $207.00/day for a total of $2,277.00; and for Route HME71, Traveler's Transit billed for 11 days at a vehicle cost of $213.00/day, for a total of $2,343.00.

110.    Of course, it was impossible—and therefore intentionally fraudulent—for Traveler's Transit to have claimed to incur daily vehicle costs for HME71 for 11 days out of the 11 billable days of the May 1- May 15 billing cycle because the internal Employee Time Sheets and Daily Attendance sheets reveal that the assigned HME71 passengers did not ride on an HME71 vehicle for at least 5 days out of that cycle (May 6-10).

111.    Nevertheless, the Route HME71 invoice corresponding to the May 15, 2019 billing cycle was submitted to MART for reimbursement anyway.

### ii.    Route HME76 Monitors

112.    In addition to submitting the false invoices for rides on vehicles that never occurred during the May 1- May 15, 2019 billing cycle, Traveler's Transit also submitted invoices which billed for Monitoring services that were never provided.

113.    When MART or GATRA assigns its routes to Traveler's Transit, the Route Sheets explicitly indicate whether a Monitor is to be provided. If one is, there will be a field on the top of the Route Sheet with the heading "Monitor" and then the name of the Monitor. If no Monitor is assigned, the Route Sheet will not have a "Monitor" heading.

114.    Route HME76 did not have a Monitor assigned to it, and therefore the Route Sheet for HME76 did not have a "Monitor" heading. Notably, the passengers on HME76 have not had a Monitor assigned to their route since at least as far back as 2017.

115.    Internal Traveler's Transit documentation confirms that no Monitor was assigned to HME76. Specifically, the Daily Sheet for May 15, 2019 has a list of the names of Monitors and to what route they were assigned that day. The Daily Sheet has no entry for a Monitor for Route HME76 on May 15, 2019.

116.    Yet the Invoice submitted to MART for Route HME76 for the billing period May 1-15, 2019 shows that Traveler's Transit billed MART for 11 days of Monitors, including for May 15, 2019, at $85/day, for a total of $935.00.

### iii.    Route NV11

117.    During the May 15, 2019 billing cycle, Traveler's Transit was also under contract with GATRA to provide transportation services for MassHealth Day Habilitation patients going to the Horace Mann Educational Associates facility in Plainville, Massachusetts, known as "Route NV11."

118.    Passengers D, F, L, and T, all MassHealth Day Habilitation patients, were assigned by GATRA to Route NV11 during the May 15, 2019 billing cycle, which meant that Traveler's Transit had to provide them with a dedicated vehicle assigned to Route NV11 to transport them to and from their destinations. But from May 6 through 10, none of these Route NV11 passengers rode on the dedicated vehicle assigned to this route.  Instead, Traveler's Transit unilaterally and without permission combined Route NV11 with another route, NV4.  This meant that the four NV11 passengers were not transported on their own vehicle but rather with the other passengers from these other routes on a shared, different vehicle

119.    Specifically, from May 6 through 10, NV11 passengers D, F, L, and T rode on a vehicle used for Route NV4, a different GATRA route, with NV4 passengers. Internal Employee Time Sheets confirm this. The Employee Time Sheet, week-ending date 5/11/19 (a Saturday), confirms the routes were combined, noting under the "route number" heading that this Employee Time Sheet was for "NV4/NV11." Further, passengers D, F, L, and T are listed under the "Consumers Name" column in addition to the five (5) NV4 passengers.   Passengers

D, F, L, and T are noted as each having received rides to and from their destinations on days the week of Monday through Friday, May 6-10.

120.     No separate vehicle was used to provide rides to Route NV11 passengers D, F, L, or T during this May 6-10 timeframe because, as the Employee Time Sheets confirm, they were riding on other vehicles alongside passengers from the other routes.

121.     The Route NV11 invoice corresponding to the May 15, 2019 billing cycle, however, states that passengers D, F, L, and T received a total of twenty-seven rides (27) on Route NV11 on their own NV11 vehicle throughout the five day period (May 6-10) when Route NV11 was in fact combined with NV4 and no separate vehicle was used to transport the NV11 passengers. Traveler's Transit then further falsely claimed it incurred daily vehicle expenses from May 6-10 of $207.00/day for vehicles it did not use on Route NV11.

122.     Specifically, the May 1-May 15, 2019 Route NV11 Invoice includes the following information: fields noting that GATRA is the broker; that "Traveler's Transit" is the contractor; that the invoice is for "NV11;" that the license plate number of the NV11 vehicle is "LV55273;" that the invoice is for the pre-populated NV11-assigned passengers, namely D, F, L, and T; and a field including each date of the billing cycle (May 1-15) where Traveler's Transit had to mark whether passengers D, F, L, and T received rides to their destinations on that date and if so, whether that was a one-way (1) or round-trip (2) ride.

123.     This Invoice was false because Traveler's Transit marked passengers D, F, L, and T as all having received their individually contracted rides (27 in all) on Route NV11 on May 6, 7, 8, 9, 10, when they did not because they rode on Route NV4 instead, as evidenced by the Employee Time Sheets, supra.

124.    This Invoice was also false because Traveler's Transit billed GATRA for the daily vehicle cost for transporting passengers D, F, L, and T for the May 6- May 10 time period, even though no such rides occurred on a dedicated vehicle assigned to NV11. Traveler's Transit therefore falsely charged GATRA $207.00/day for the cost of a vehicle that was never used on NV11.

125.    This intentional falsity is further evidenced by the fact that Traveler's Transit did not adjust or take a discount on the daily vehicle cost for the vehicles that were in fact used to transport the combined NV11 passengers with the passengers from NV4. Instead, Traveler's Transit double-billed the government for *__both__* the vehicles used to transport the passengers on the combined routes *__and__* for the phantom vehicles that were never used to transport the NV11 passengers on their own route.

126.    This double-billing is confirmed by comparing the May 1-May 15, 2019 Route NV4 Invoice—which shows that Traveler's Transit billed GATRA for the vehicle cost for the vehicle with license-plate LV574358 used to transport the assigned NV4 passengers each day from May 6-10—with the aforementioned May 1- May 15, 2019 Route NV11 invoice, which shows that Traveler's Transit billed for the vehicle cost for the vehicle with license-plate LV55273, a vehicle which was not used to transport the NV11 passengers each day from May 6-10 because the Employee Time Sheets confirm those passengers instead rode on the vehicle used for the combined NV11/NV4 Route.

127.    It was impossible—and therefore intentionally fraudulent—for Traveler's Transit to have claimed to incur daily vehicle costs for NV11 for May 6-10 of the May 1- May 15 billing cycle because the internal Employee Time Sheets reveal that the assigned NV11 passengers did not ride on an NV11 vehicle from May 6-10.

128.    Nevertheless, the Route NV11 invoice corresponding to the May 15, 2019 billing cycle was submitted to GATRA for reimbursement anyway.

129.    All of the above documentary examples of Traveler's Transit's fraud are merely a small representative sample of hundreds of similarly false invoices in Relator's possession which were created during a years-long scheme which resulted in the continuous and systematic submission of false claims to the government.

## FIRST CAUSE OF ACTION

### False Claims Act: 31 U.S.C. § 3729(a)(1)(A): Presenting and Causing False Claims: Defendant Traveler's Transit

130.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

131.    As alleged herein, Defendant Traveler's Transit violated the False Claims Act when it presented and caused to be presented materially false and fraudulent transportation invoices for approval and payment to the government.

132.    Traveler's Transit presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

133.    The invoices were false for at least three reasons. First, each invoice that claimed the assigned passengers were transported as agreed—that is, on an individual route on a dedicated vehicle as assigned by MART or GATRA, pursuant to those respective contractual arrangements—was false on its face every time Traveler's Transit in fact secretly and without authorization combined those passengers with another route with other passengers and/or on another vehicle.

134.    Because Traveler's Transit withheld the true nature of the facts surrounding the underlying route for which it billed—i.e., that the route was comprised of illicitly-combined passengers resulting in ride times longer than ninety-minutes—each of the invoices it submitted in which it indicated the rides had occurred as agreed, was false.

135.    Second, the invoices were false because once it had combined passengers from their assigned route (and dedicated vehicle assigned to that route) with passengers from another route, Traveler's Transit double-billed the government for ***both*** the vehicles used to transport the passengers on the combined routes ***and*** for the phantom vehicles that were never used to transport the passengers on their assigned route.

136.    Third, every invoice which billed for Monitoring services which Traveler's Transit did not provide was false.

137.    Traveler's Transit alone made the decision to eliminate or combine certain transit routes, without the contractually-required authorizations from MART or GATRA, but it did not thereafter reduce the amount that it billed. The invoices that Traveler's Transit submitted to MART and GATRA were therefore inflated, and the extra money Traveler's Transit received in reimbursements because of its fraud was made available and supplied by the United States.

138.    Thus, the United sustained damages because of Defendants' wrongful conduct and submission of false claims.

## SECOND CAUSE OF ACTION

**False Claims Act: 31 U.S.C. § 3729(a)(1)(A): Presenting and Causing False Claims: Defendants MART and GATRA**

139.    As alleged herein, Defendants MART and GATRA violated the False Claims Act when they presented and caused to be presented materially false and fraudulent transportation invoices for approval and reimbursement to MassHealth and DDS.

140.    MART and GATRA presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

141.    By failing to implement adequate procedure to verify that the invoices submitted to MassHealth and DDS were accurate and devoid of errors, MART and GATRA violated the False Claims Act.

142.    Thus, the United States sustained damages because of Defendants' wrongful conduct and submission of false claims.

### THIRD CAUSE OF ACTION

**False Claims Act 31 U.S.C. § 3729(a)(1)(B): False Statements Material to False Claims**

**Defendant Traveler's Transit**

143.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

144.    Defendants made, used, or caused to be used false records or statements to get false or fraudulent claims paid and approved by MassHealth and DDS and that were material to the payment of the false claims at issue in this case.

145.    Traveler's Transit made false certifications and representations when submitting false claims for payment.  Traveler's Transit's false certifications of its MART and GATRA invoices caused MassHealth and DDS to approve reimbursement claims, which were paid from state and federal money.

146.   The express false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

147.   Defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

148.   Thus, the United States sustained damages because of Defendants' wrongful conduct.

### FOURTH CAUSE OF ACTION

**False Claims Act 31 U.S.C. § 3729(a)(1)(B): False Statements Material to False Claims**

**Defendants MART and GATRA**

149.   Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

150.   Defendants made, used, or caused to be used false records or statements to get false or fraudulent claims paid and approved by MassHealth and DDS and that were material to the payment of the false claims at issue in this case.

151.   MART and GATRA made false certifications and representations when submitting false claims for payment. MART and GATRA's false invoices caused MassHealth and DDS to approve reimbursement claims, which were paid from state and federal money.

152.   The express false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

153.   Defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

154.   Thus, the United States sustained damages because of Defendants' wrongful conduct.

## FIFTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(1)

### Defendant Traveler's Transit

155.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

156.    As alleged herein, Defendant Traveler's Transit violated M.G.L c. 12, § 5B(a)(1) when it presented and caused to be presented materially false and fraudulent transportation invoices for approval and reimbursement to the government.

157.    Traveler's Transit presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

158.    The invoices were false for at least three reasons. First, each invoice that claimed the assigned passengers were transported as agreed—that is, on an individual route on a dedicated vehicle as assigned by MART or GATRA, pursuant to those respective contractual arrangements—was false on its face every time Traveler's Transit in fact secretly and without authorization combined those passengers with another route with other passengers and/or on another vehicle.

159.    Because Traveler's Transit withheld the true nature of the facts surrounding the underlying route for which it billed—i.e., that the route was comprised of illicitly-combined passengers resulting in ride times longer than ninety-minutes—each of the invoices it submitted in which it indicated the rides had occurred as agreed, was false.

160.    Second, the invoices were false because once it had combined passengers from their assigned route (and dedicated vehicle assigned to that route) with passengers from another

route, Traveler's Transit double-billed the government for ***both*** the vehicles used to transport the passengers on the combined routes ***and*** for the phantom vehicles that were never used to transport the passengers on their assigned route.

161.    Third, every invoice which billed for Monitoring services which Traveler's Transit did not provide was false.

162.    Traveler's Transit alone made the decision to eliminate or combine certain transit routes, without the contractually-required authorizations from MART or GATRA, but it did not thereafter reduce the amount that it billed. The invoices that Traveler's Transit submitted to MART and GATRA were therefore inflated, and the extra money Traveler's Transit received in reimbursements because of its fraud was made available and supplied by Massachusetts.

163.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct and submission of false claims.

## SIXTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(1)

### Defendants MART and GATRA

164.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

165.    As alleged herein, Defendants MART and GATRA violated M.G.L c. 12, § 5B(a)(1) when they presented and caused to be presented materially false and fraudulent transportation invoices for approval and reimbursement to MassHealth and DDS.

166.    MART and GATRA presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

167.    By failing to implement adequate procedure to verify that the invoices submitted to DDS and MassHealth were accurate and devoid of errors, MART and GATRA violated the Massachusetts False Claims Act.

168.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct and submission of false claims.

## SEVENTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(2)

### Defendant Traveler's Transit

169.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

170.    Defendant made, used, or caused to be used false records or statements to get false or fraudulent claims paid and approved by DDS and MassHealth, and that were material to the payment of the false claims at issue in this case.

171.    Traveler's Transit made false certifications and representations when submitting false claims for payment.  Traveler's Transit's false certifications of its MART and GATRA invoices caused DDS and MassHealth to approve reimbursement claims, which were paid from state and federal money.

172.    The express false certifications and representations made and caused to be made by Defendants were material to Massachusetts's payment of the false claims.

173.    Defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

174.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct.

## EIGHTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(2)

### Defendants MART and GATRA

175.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

176.    Defendants made, used, or caused to be used false records or statements to get false or fraudulent claims paid and approved by DDS and MassHealth, and that were material to the payment of the false claims at issue in this case.

177.    MART and GATRA made false certifications and representations when submitting false claims for payment.  MART and GATRA's false invoices caused MassHealth and DDS to approve reimbursement claims, which were paid from state and federal money.

178.    The express false certifications and representations made and caused to be made by Defendants were material to Massachusetts' payment of the false claims.

179.    Defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

180.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct.

## NINTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(8)

### Defendant Traveler's Transit

181.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

182.    Defendant entered into an agreement, contract or understanding with an official of the commonwealth or a political subdivision thereof knowing the information contained therein is false.

183.    Traveler's Transit entered into agreements with MART and GATRA subsequent to the commission of fraudulent activity as alleged herein, thereby knowing that the contracts it signed contained information that was false because Traveler's Transit was not complying, and had no intention to comply, with its obligations thereunder.

184.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct.

## TENTH CAUSE OF ACTION

### Massachusetts False Claims Law, M.G.L c. 12, § 5B(a)(8)

### Defendants MART and GATRA

185.    Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

186.    Defendants entered into an agreement, contract or understanding with an official of the commonwealth or a political subdivision thereof knowing the information contained therein is false.

187.    Defendants MART and GATRA's contracts with EOHHS and MassHealth required MART to have procedures to verify that scheduled trips were performed as authorized and as billed. However, as alleged herein, MART and GATRA's verification procedures were not sufficient to prevent Traveler's Transit from submitting false invoices to MART and GATRA

188.    Thus, Massachusetts sustained damages because of Defendants' wrongful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself individually and acting on behalf of the United States and the Commonwealth of Massachusetts prays that judgment be entered against Defendants as follows:

That this Court enter judgement against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation, pursuant to statute, with interest.

That Relator be awarded the maximum amount available under Sections 3730(d) and 3730(c)(5) of the False Claims Act.

That Relator be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

And such other relief shall be granted in favor of the United States and the Realtor as this court deems just and proper.

That this Court enter judgement against Defendants in an amount equal to three times the amount of damages Massachusetts has sustained because of Defendants' actions, plus a civil penalty for each violation, pursuant to statute, with interest.

That Relator be awarded the maximum amount available under Section 12, § 5F(1) of the Massachusetts False Claims Act.

That Relator be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 12, § 5F(3) of the Massachusetts False Claims Act.

And such other relief shall be granted in favor of Massachusetts and the Realtor as this court deems just and proper.

Relator hereby demands a jury trial.


DATED ___4/5/2d___


                                        Respectfully Submitted:


                                        _____
                                        Michael A. Lesser, Esq. BBO# 631128
                                        Evan R. Hoffman, Esq. BBO# 678975
                                        **THORNTON LAW FIRM LLP**
                                        One Lincoln Street, 13th Floor
                                        Boston, MA  02111
                                        (Tel.):  617-720-1333
                                        (Fax) : 617-720-2445
                                        E-mail:  mlesser@tenlaw.com
                                        E-mail:  ehoffman@tenlaw.com